Filed 8/3/21  In re E.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re E.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> Q.B. et al., <br><br> Defendants and Appellants. | D078462 <br><br> (Super. Ct. Nos. EJ4287B-C) |

APPEALS from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant Q.B.

Elena S. Min, under appointment by the Court of Appeal, for Defendant and Appellant M.S.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

In this juvenile dependency case (Welf. & Inst. Code,[1] § 300 et seq.), Q.B. (Father) and M.S. (Mother) (together, parents), each appeal from section 366.26 orders terminating their parental rights and selecting adoption as the permanency plan for their two children. Joining in each other's arguments, appellants contend that the dependency court committed reversible error when it ruled that the parents did not establish the beneficial parent/child exception or the beneficial sibling exception to overcome the statutory preference for adoption. The parents maintain that the court should have selected legal guardianship for the children's permanency plan. We conclude that the court did not abuse its discretion and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Dependency Proceedings*

In June 2018, the San Diego County Health and Human Services Agency (Agency) petitioned the juvenile court for six-month-old E.B. under section 300, subdivision (a). As discussed in the initial detention report, the parents subjected E.B. to numerous instances of domestic violence between them, which posed an imminent threat to her health and safety. The first

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

reported incident occurred in March 2018.[3]  After the Agency intervened, Mother filed for and received a restraining order in April 2018, protecting her and E.B. from Father.  However, both parents continued to violate the order and engage in further domestic violence.  Although the Agency offered the parents voluntary services, they initially refused to engage in the services, avoided the caseworker, and would not allow the caseworker to have contact with E.B.  The Agency believed that there was a "substantial danger that [E.B.] w[ould] suffer physical or emotional harm due to continued exposure to violent altercations between [parents], which could cause [E.B.] to be neglected and/or emotionally harmed."

Based on the Agency's investigation, in June 2018 the juvenile court found that the Agency had made an adequate showing that E.B. was a child described by section 300, subdivision (a), and issued a protective custody warrant to detain her in out-of-home care.  The court ordered supervised visitation for the parents and voluntary reunification services.[4]

In its initial jurisdiction report filed in July 2018, the Agency explained that the paternal grandmother was temporarily caring for E.B. and that the child was "doing well" in the placement.  The report detailed that Mother and Father "have a history of domestic violence" that included at least five physical altercations over the past two years, "some of which involved

[3]     Mother has another son from a prior relationship, M.E., who was also present at the initial triggering incident.  M.E. primarily resided with his father and after this incident, the Agency recommended that he remain in the care of his father.  M.E. is discussed in this opinion only for purposes of the beneficial sibling exception.

[4]     In the same order, the juvenile court also ordered that M.E. be removed from Mother's care, granted custody of M.E. to M.E.'s father, and granted M.E. "reasonable unsupervised visitation with his sister [E.B.]."

choking and some of which were in [E.B.'s] presence." Mother denied that any violence between her and Father included choking, but Father admitted that "he and the mother do have a history of choking each other." Father denied, however, that this ever occurred in E.B.'s presence. Mother admitted to daily marijuana use but denied frequent alcohol use, stating that she "only drinks alcohol [a] couple times a year." Father acknowledged occasional marijuana and alcohol use.

The Agency did not believe that the parents "[could] protect [E.B.] at this time due to concerns for the parents continuously exposing [her] to ongoing domestic violence, unsafe environments and people. The Agency [was] concerned the parents will continue to prioritize their volatile relationship over the safety of [E.B.] and again expose [her] to dangerous situations, that could result in [E.B.] being severely hurt or killed." The Agency recommended that the court find E.B. to be a child described by section 300, subsection (b) and declare her a dependent of the juvenile court. The Agency further recommended "reasonable, separate and supervised visitation" for the parents. At E.B.'s jurisdiction and disposition hearing in July 2018, the juvenile court set the matter for trial and ordered the parents to attend a pretrial settlement conference.

In advance of the hearing, the Agency submitted an addendum report, which noted that the parents continued to violate the restraining order. This included a July 2018 incident of domestic violence between the parents, which coincided with their consumption of alcohol. Just days after that incident, mother was arrested for "being too drunk and causing a disturbance" at Father's residence. Mother acknowledged that she had a drinking problem and expressed willingness to participate in alcohol abuse services. She enrolled in services. The service provider later reported to the

4

Agency that Mother was "doing really good!" Father enrolled in parenting services and a domestic violence group. He also reported voluntarily attending "AA meetings on the side." The Agency included an updated case plan for Father to include substance abuse testing, but otherwise had "no new recommendations at this time."

In August 2018, the matter did not resolve during the settlement conference and proceeded by way of a document trial. The court sustained the Agency's petition, finding that E.B. came within section 300, subdivision (b), and declared E.B. a dependent of the juvenile court under section 360, subdivision (d). The court placed E.B. with her paternal grandmother and ordered reunification services for the parents. The court gave the social worker discretion to lift the requirement that visits be supervised and to expand visits to overnight visits and a 60-day trial visit.

In advance of the February 2019 six-month review hearing, the Agency reported that, at some point during the review period, Mother and Father moved back in together but had since separated once again. Mother had also terminated the active restraining order against Father. She disclosed that she was pregnant with the parents' second child. Mother was actively participating in parenting, substance abuse, and domestic violence treatment programs, but she was not participating in individual therapy. Father was also actively participating in domestic violence and parenting education programs.

Both parents maintained regular supervised visits during this time. The visit coach reported that "father does well in taking on the parenting role overall. 'He is [empathetic], affectionate, is learning about [E.B.'s] development and places her needs before his own. This is all very natural and he does meet all of [E.B.'s] basic needs.' " Mother's coach reported that

she " 'has been observed using positive parenting techniques including: giving lots of eye contact, encouragement and praise, reading her baby's cues and responding respectfully, using a warm tone of voice, and acknowledging her baby's emotions.' " The Agency agreed with the parents' requests to move to unsupervised visits but recommended that the parents continue to have separate visitation. The Agency also recommended extending reunification services for six more months, during which time E.B. would remain with the paternal grandmother.

At the six-month review hearing, the court followed the Agency's recommendation and ordered reunification services to the 12-month review. The court also directed the Agency to consider allowing the parents to visit E.B. together.

In late April 2019, the parents progressed to overnight visits and in June 2019, to a 60-day trial visit. The parents also began living together once again and mother gave birth to the parents' second child, B.B. The parents continued to show progress in their respective treatment programs. The Agency recommended six additional months of family maintenance services for the parents.

At the August 2019 12-month review hearing, the court found that the parents had made substantial progress with their case plans, placed E.B. in the parents' care, and ordered continued family maintenance services. However, by mid-August, the Agency received a report of a domestic violence incident between the parents in their home. E.B. and B.B. were not present; they had been staying with the grandmother for the night. However, M.E. was home and after the altercation, during which both parents were intoxicated, it was reported that Mother drove with M.E. while intoxicated. Mother denied this allegation.

The Agency recommended that E.B. "be re-removed from the parents" and filed a supplemental petition under section 387. After completing its investigation of the incident, the Agency reported, "[t]he parents are unable to protect the dependent child because they are in denial of the seriousness of the allegations. . . . The Agency cannot trust the parents at this point, as they did not demonstrate the ability to follow the Agency's recommendations during the open family maintenance case as evidence[d] by [M.E.'s] statements of the domestic violence incident. ¶ Based on the current circumstances and previous incidents, it is clear that the parents have a volatile relationship in which they choose to engage in violent altercations in the presence of the child. Currently, [E.B.] is in need of the [c]ourt's further intervention at this time as she cannot safely remain in the home without placing her at great risk of harm."

The Agency petitioned the court pursuant to section 300, subdivision (a) to bring B.B. under the court's jurisdiction and applied for a protective custody warrant. The Agency recommended that the parents receive separate supervised visitation with B.B. and advised the parents that because of B.B.'s young age, the court might limit them to six months to show "substantial progress" with their court-ordered services. On August 23, 2019, the court placed E.B. and B.B. with the paternal grandparents. That same month, the court found that the Agency had made prima facie showings that B.B. and E.B. were the persons described by sections 300, subdivision (b)(1) and 387 respectively and that they required protection. The court determined detention out of the parents' custody to be in the children's best interests.

In a September 2019 addendum, the Agency reported that the previous services ordered in E.B.'s case had been ineffective in deterring the parents

7

from engaging in domestic violence. The Agency recommended that the court terminate services for E.B. and set a section 366.26 hearing. However, by the time of the contested adjudication and disposition hearing in November 2019, the Agency changed its recommendation to extend both parents' services in E.B.'s case to the 18-month mark. The parents submitted waivers on E.B.'s section 387 petition and the court followed the recommendation.

During the reporting period, the parents initially began showing sustained improvement on their case plans. By mid-November 2019, each parent progressed to unsupervised visitation. The court continued E.B.'s 18-month review hearing to allow time for her to transition to the parents' home. But by February 2020, the Agency reverted to its recommendation to terminate services for E.B. Mother was in poor compliance with her substance abuse program and there were reports that she had relapsed. In addition, the paternal grandmother reported that Father had called her numerous times while under the influence of alcohol. He had also quit his job and received an eviction notice. During a call with a social worker in late January 2020, Father seemed to be under the influence. He refused the Agency's request to submit to a random drug test and became "irate" during the call. He threatened to kill Mother and the grandmother. The social worker reported this threat to the police and the police arrested Father that day for resisting arrest and threating great bodily injury.

At a review hearing for E.B. in February 2020, the parents set the matter for trial. The court set dates for a pretrial status conference and a contested hearing, which was later continued due to the COVID-19 pandemic. B.B.'s six-month review hearing took place in March 2020 and the parents set B.B.'s matter for trial, as well, on the issue of unsupervised visitation and

reasonable services. The court subsequently continued the trial in B.B.'s case to allow the hearings for E.B. and B.B. to coincide.

In the meantime, the parents again began to show progress. Each individually enrolled in drug treatment. Father tested positive for high levels of marijuana in March 2020, but by early April, his drug treatment case manager reported that his levels were going down and that he had likely not used marijuana recently. In late April, Mother remained in good standing with her program and had maintained sobriety. She continued this pattern through mid-June 2020. Father also had nearly five months of sobriety at this time, was working with a sponsor, received positive reports from his drug treatment program, and was participating in individual therapy.

A child and family team (CFT) meeting was held on June 17, 2020. The Agency agreed to start unsupervised visits for the parents with B.B., and to explore a 60-day trial visit with the Mother and E.B. The parents acknowledged that their visits with the children were to remain separate.

On the day after the CFT meeting, the parents were arrested in Arizona for domestic-violence related charges. Father was also charged with driving under the influence. The parents had gone to Arizona together to celebrate the expanded visitation awarded to them the day prior. As a result of the new incident, the Agency recommended that the Mother's and Father's reunification services be terminated in both E.B.'s and B.B.'s cases. The parents opposed the recommendation at the June 24, 2020 pretrial status conference, and they confirmed both matters for trial.

In July 2020, the court held the contested 18-month review hearing for E.B. and the six-month review hearing for B.B. The court found that the parents had demonstrated ongoing issues with substance abuse and domestic violence, even after participating in services, and that B.B. could not safely be

returned to the parents by the 12-month review date.  The court therefore set a permanency planning hearing pursuant to section 366.26.  The parents later requested a contested hearing.  In December 2020, pending the contested hearing, the parents got into an argument while dining out and Mother was arrested.

B. *The Section 366.26 Permanency Hearing*

The contested section 366.26 hearing occurred on January 8, 2021.  The juvenile court admitted the following reports:  the June 2018 initial detention report for E.B., the Agency's 12- and 18-month status review reports,  the October 2020 section 366.26 report, and two December 2020 addendum reports.  The court also admitted social worker Jamayka Hicks's curriculum vitae.  Mother and Hicks testified.  Although the juvenile court had authorized a bonding study at Mother's request, the record is silent as to whether one was ever performed.  Neither the parents nor the Agency called any experts to testify.

    1. *Testimony and Evidence*

        a. *The Agency's Section 366.26 Reports*

Hicks prepared the Agency's initial October 2020 section 366.26 report and addenda.  Hicks had been the assigned social worker since July 2020.  The Agency's October 2020 report detailed the history of the dependency proceedings up to the present date.  The Agency assessed that the children were both generally and specifically adoptable and the paternal grandmother had confirmed her desire to adopt both children.  The grandmother had been involved in the children's lives since birth and they had been placed with her throughout the dependency proceedings.  The report stated that the grandmother "has demonstrated that she is able to provide for the children's

10

daily needs" and that she is " 'completely' dedicated to the permanent plan of adoption," stating that she " 'would do anything for them.' "

Regarding visitation, the report stated, "Both parents have, however, been consistent in visitation. It is clear that both parents love their children very much; their consisten[cy] [*sic*] in visitation and continued willingness to engage in services, even after set back[s], demonstrates that." The report also stated that "[t]he caregiver reported that visits are positive. Each parent visits separately[,] and . . . during the visits[,] they each complete basic activities. They play with the children, have dinner, and bathe them at times." "When [Mother] arrived [for a supervised visit], both children were glad to see her. [E.B.] ran to her [Mother] and hugge[d] her. Throughout the visit, [Mother] did many activities with the children." Nevertheless, the Agency believed "that the parent-child relationships do not outweigh the benefits of adoption such as stability, safety, and a nurturing environment, as the parents have not been able to demonstrate this for the children."

Regarding nondependent sibling M.E., the Agency's report detailed that grandmother viewed M.E. "as another one of her grandchildren and has enjoyed trips out to the lake with [all of the children] and [M.E.] spent the night in [the grandparents'] home." Despite this, the Agency asserted that the siblings "have not had many shared experiences" between them, although grandmother has "continued to ensure sibling contact." The children have not resided in the same home for a significant period of time and the Agency did not believe that the sibling exception applied.

### b. Social Worker's Testimony

Hicks testified on behalf of the Agency that the parents' rights should be terminated, the beneficial parent/child exception did not apply, and adoption should be selected as the children's permanency plan.

11

She testified that Mother visited the children on a regular basis, two or three times a week for four to five hours a visit. She acknowledged that the caregiver "has allowed extra visits as well." Hicks testified that during visits, Mother was helpful taking care of the children. She bathed, fed, played with, and put the children to bed. The children enjoyed Mother's visits.

Hicks testified that she did not believe that the parents had a strong bond with the children. As to Mother, although the children called her, "mom," the children did not "know her as mom." Hicks testified that the children also referred to the caregiver as "mom" and they looked to the caregiver to "provide their daily needs." During Hicks's observations, there were "a couple instances" where E.B. became upset and she looked to the caregiver to "calm[ ] her or explain[ ] what the rules are to her." This was significant to Hicks because, even in those instances where Mother was present, E.B. "[was] looking at the caregiver as the person to provide those boundaries, those rules, that comfort. . . ."[5] Hicks acknowledged, however, that there were times when both children also went to Mother for comfort.

With respect to Father, Hicks testified that his visitation with the children had been "very consistent." He typically visited the children three times a week, for four hours a visit. During his visits, Father took an "active parental role." The children greeted him with a hug or kiss. He fed, bathed, played with, and watched television with the children.

---

[5]    On appeal, Mother argues that the December 2020 addenda described one such incident where E.B. had a "tantrum" after Mother set a boundary with her. E.B. called her Mother, "mean," and reached for the caregiver, who "was able to calm [E.B.] down." Mother contends that "it should [be] [*sic*] of little surprise that [E.B.] sought comfort on that occasion by someone other than the person with whom she was mad."

12

Hicks did not expressly address her evaluation of Father's bond with the children in her report. She testified that she did not believe that the children were "very bonded" to Father. In Hicks's experience, children who are "very bonded" with their parent have "delays, or difficulties in the [placement] home," but in this case, the children "have done very well with their placement." Hicks agreed, however, that children placed in a relative caregiver's home do not have this type of problem "all the time." Hicks also acknowledged that the caregivers—the paternal grandparents—had been actively involved in the children's lives even before the dependency case.

Despite her testimony regarding the parent/child bond, Hicks testified that the children knew Father as their father and were easily soothed and comforted by him. When E.B. became upset during his visits, "she [went] to him for comfort. He [was] able to soothe her and put those boundaries in place, and she does listen."

Regarding the beneficial parent/child exception, Hicks testified that if Mother's parental rights were terminated, "to some extent it would be" detrimental to the children. Similarly, she acknowledged that it would be detrimental "to some extent" if the children did not see their Father again, and specifically, that it would be an "emotional detriment." However, the Agency recommended adoption for the children "because [Hicks did not] believe that emotional detriment outweigh[ed] the benefits of adoption; such as, safety and stability that this caregiver's home provides to the children." Her assessment "[was] not that there is no parent/child bond. [Her] assessment [was] that bond does not outweigh the benefits of adoption." She also testified that the caregiver "has always made it a priority to have her home for [parents] to visit. That includes holidays. That includes birthday parties. She has had the parents involved with planning the birthday party

13

for [E.B].  She is very committed to making sure that continues, despite whatever outcome might be decided today."

### c. *Mother's Testimony*

Mother testified that she visited the children more often than Hicks reported, usually every day, for over six hours a visit.  During her visits, she prepared meals, fed the children, bathed them, played with them, and put them to bed.  She also testified that the caregivers "trust me.  They know I am good with the kids.  They allow me to be mom.  They step back and, you know, pretty much are, 'Okay.  Mom is here.  You gotta do your thing.'  ¶ They are not hovering over me.  They are not constantly watching me.  They trust me.  They know I am not going to do anything with them."  At bedtime, she would prepare a bottle for B.B. and rock him if he needed comfort.  She testified, " 'And I kiss them good night and tell them I love them, and I will see them the next day.' "

Mother disagreed with Hicks regarding how the children refer to the caregivers.  She claimed the children called grandmother, "nani," and grandfather, "papa."  She testified that the caregivers refer to her as "mommy" or "mamma" with the children, stating, " '[t]hey never take [that] away from us.  They always let us be mom and dad.' "  She also disagreed with Hicks as to whether the children came to her for comfort and boundaries.  With infant B.B., she testified that he "always" came to her, stating he, "[c]hooses me over everyone."  With respect to toddler E.B., she testified that their "bond has gotten stronger.  And she does come to me for comfort, and stuff.  ¶  And I will be soothing her, and [caregiver] will come and say, 'baby, are you okay?'  And [E.B.] will cross over to her.  So she gets comfort from both of us."

Mother also testified about the children's relationship with Father stating, " 'It's my favorite relationship to see. [E.B.] is a complete Daddy's girl. She knows who her dad is. And that is her daddy. And it is love like no other bond, like no other moment. When she sees him, she lights up. And it's just definitely something you can't break. And he loves that little girl to pieces.' " She testified that Father's relationship with B.B. is "really good. And [Father] knows well that that is his boy. From what I know, when [B.B.] sees his dad, he knows who his dada is and refers to him as 'dada.' It's a close bond."

Regarding the beneficial sibling exception, Mother testified that she brought M.E. to visitation with the children. She described that E.B. "screams and lights up and runs to [M.E.] the moment we walk through the doors." Regarding M.E.'s and E.B.'s bond, she described the two as "very tight" and "close." M.E. also had "a good bond as well" with infant B.B., although she recognized that "[B.B.] is not at that stage [of] understanding this is my brother, like [E.B.] is." If contact between the siblings were severed, Mother testified, "I believe as well it would really affect [E.B.] because she loves [M.E.] so much."

2. *The Juvenile Court's Rulings*

The juvenile court found that the children were adoptable by clear and convincing evidence, determined that the parents had not established either the beneficial parent/child or sibling exception, and ordered adoption as the children's permanent plan. After discussing the parents' inability to resolve the issues that had brought the children under the court's dependency jurisdiction, the court stated, "But while [the parents] are on that journey, their children should not have to wait. Both statutes and case law tell[ ] us that after this much time, at this stage of the proceedings, the court must

15

prioritize the children's need for stability and permanence." The court found that "the children are in a home where they are safe, loved and thriving." " 'The children's daily needs are being met by the paternal grandmother.' "

In finding that the parents failed to establish the beneficial parent/child exception, the court stated, "the question before the court is not whether the parents love their children, which, certainly they do." The court did not make express findings as to the first two elements of the exception (regular visitation and beneficial parent-child relationship). (§ 366.26, subd. (c)(1)(B)(i)). But on the third element, the court concluded that "the benefits of adoption in this case do outweigh the potential detriment of any hypothetical severance of [the] contact [between parents and the children]."

Further, "there [was] no evidence that this caregiver would sever the relationship between the biological parents and these children. To the contrary, the caregivers have enlarged and facilitated their relationship. . . . Even if the court believed there was a possibility of some theoretical severance of contact with the parents, the court finds the benefits of adoption outweigh[ ] the detriment that would occur to the children. Of course, if the children were prevented from contact with the parents, their position that that would be damaging and that that would run the risk of the children feeling abandoned. And that is never a good thing."

On the issue of legal guardianship as the option for permanency, the court stated, "[Mother] has been arguing for guardianship as a lesser plan; essentially, because she is wanting more time. She is wanting more time to reunify with the children. . . . Here, these children have been subjected to multiple injuries of instability as a result of their parents' substance abuse, domestic violence and repeated arrests. . . . And we cannot subject these children to that."

16

In finding that the beneficial sibling exception did not apply, the court stated, "There is current contact between [sibling] and the other children. Again, there is no evidence that the current caregiver would do anything to thwart that relationship for some reason. And the evidence is she treats [M.E.] as one of her own. Granted, even if we did not have this, they have not had a sibling bond. These children have not lived together most of their lives. They don't share common experiences and it is not the type of bond that the legislature had in mind in creating the sibling bond exception."

## DISCUSSION

A. *The Beneficial Parent-Child Relationship Exception to the Legislative Preference for Adoption*

### 1. *Contentions on Appeal*

The parents separately appeal and each contends that the juvenile court erred in terminating their parental rights and selecting adoption as the permanent plan for the children following the selection and implementation hearing held pursuant to section 366.26. The parents challenge the court's determination that they failed to establish the beneficial parent-child relationship exception. Each parent claims that the court should have selected legal guardianship as the children's permanent plan.

### 2. *Applicable Law and Standard of Review*

At the section 366.26 hearing, the focus of the dependency process changes from reunification services to the children's needs for permanency and stability. " 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53 (*Celine R.*).) "Indeed, when the court orders the section 366.26

17

hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*),[6] citing *In re Edward R.* (1993) 12 Cal.App.4th 116, 126.)

The court has three permanency options at the section 366.26 hearing: adoption, legal guardianship, or long-term foster care. (§ 366.26, subd. (b).) Adoption "requires terminating the natural parents' legal rights to the child," while legal guardianship or foster care leaves parental rights in place. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn H.*).)

Of the three options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 573.) The court's first question in determining the appropriate permanency option is thus to "determine by clear and convincing evidence whether the child is likely to be adopted." (*Caden C.*, *supra*, 11 Cal.5th at p. 630, citing § 366.26, subd. (c)(1).) Where the court answers that question in the affirmative, and if "the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption." (*Ibid.*) " 'Only if adoption is not possible, or if there are countervailing circumstances, or if it is not in the child's best interests are other, less permanent plans, such as guardianship or long-term foster care considered.' [Citation.]" (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.)

To overcome this statutory preference for adoption, it is a parent's burden to establish that adoption is not in the child's best interests through

---

[6] All parties were given the opportunity to, and did, submit supplemental briefing to discuss the impact of the California Supreme Court's decision in *In re Caden C.* on this case.

one of four statutory exceptions. (*Caden C.*, *supra*, 11 Cal.5th at p. 629 ["[E]ven when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute"].) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Celine R.*, *supra*, 31 Cal.4th at p. 53.) Here, the parents contend that they established that the beneficial parent/child exception applied.

This exception requires the parents to establish, by a preponderance of the evidence, "(1) regular *visitation and contact* [with the children], and (2) a *relationship*, the continuation of which would *benefit* the child[ren] such that (3) the termination of parental rights would be *detrimental* to the child[ren]." (*Caden C.*, *supra*, 11 Cal.5th at p. 631; § 366.26, subd. (c)(1)(B)(i)).)

For the first element, the parents must show that they maintained "regular visitation and contact with the child[ren]." (§ 366.26, subd. (c)(1)(B)(i).) For the second element, a parent must show that "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i; *Caden C.*, *supra*, 11 Cal.5th at pp. 620, 636 ["the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"].) Attachment or bonding between the parent and child is the central focus in the second element, although "[a]gain here, the focus is the child." (*Id.* at p. 632.) To determine the strength of the bond, the court may rely on evidence from "[s]ocial workers, interim caretakers and health professionals [who] will have observed the parent and child interact and provided information to the court." (*Autumn H.*, *supra*, 27 Cal.App.4th at

19

p. 575.)  Factors to consider include "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction[s] between parent and child, and the child's particular needs." (*Id.* at p. 576.)  "[C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, at p. 632.)

The third element—whether termination of parental rights would be detrimental to the child—is the most difficult question for the juvenile court to resolve.  Where the court has found that regular contact and visitation have continued, and that this contact has created a relationship that benefits the child, the court must "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  The California Supreme Court recently referred to this as "a subtle enterprise," explaining that " 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C.,* at p. 634, quoting *Autumn H.*, at p. 575.)  "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.,* at p. 633.)  "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634, quoting § 366.26, subd. (c)(1)(B)(i), italics added.)

"While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) " 'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' [Citations.]" (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) The appellant who challenges the court's judgment or findings has the burden to show that substantial evidence does not support the court's judgment or findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947 (*L.Y.L.*).)

### 3. *The Parents Did Not Establish that the Beneficial Parent/Child Exception to Adoption Applies*

Although both parents established that they maintained consistent visitation with the children and showed the existence of positive parent-child relationships, they have failed to show that the juvenile court abused its discretion by finding that that the benefits of adoption outweighed the detriment that would result from terminating parental rights.

As to the first element, although the juvenile court did not make an express finding as to regular visitation and contact, substantial, undisputed evidence shows that both parents met this prong. (See § 366.26, subd. (c)(1)(B)(i).) Although Mother testified that she visited the children nearly every day, for roughly six hours per visit—more visitation than the Agency acknowledged—the Agency nevertheless agreed that "[b]oth parents have . . . been consistent in visitation." It was "clear" to the Agency "that both parents love their children very much; their consisten[cy] in visitation and continued willingness to engage in services, even after set back[s],

21

demonstrates that." In its ruling, the court, too, acknowledged that the "caregivers have enlarged and facilitated [parents'] relationship" with the children throughout the dependency proceedings.

As to the second element, a beneficial parent-child relationship, again, the juvenile court did not make an express finding. The Agency argues that the parents failed to make the requisite showing as to this element. We disagree. The record contains substantial evidence demonstrating that both parents had a parent/child relationship with each of the children and that the parents met their burden to show that continuation of the parent/child relationship would benefit the children. (See § 366.26, subd. (c)(1)(B)(i).)

The relevant evidence was undisputed. During visits, both parents assumed parental roles with the children, including feeding, bathing, playing with, and otherwise caring for them. There is also no dispute about the nature of the positive, supportive bond that each parent continued to create and foster with the children through their consistent visitation. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575 ["The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences."].) The evidence regarding how the children "feel about, interact with, look to, or talk about their parents" was almost exclusively positive. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632.) Indeed, social worker Hicks did not dispute the existence of a bond between the parents and the children. The evidence shows that the parents' level of continued interaction with the children conferred far more than mere "incidental" benefits. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 555 [" 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . . The relationship

22

arises from the day-to-day interaction, companionship and shared experiences.' [Citation.]"].)

In arguing that that the parents failed to occupy a parental role, the Agency focuses exhaustively on the parents' inability to resolve the issues that brought them under the court's jurisdiction. However, *Caden C.* makes clear that this is improper. (*Caden C.*, *supra*, 11 Cal.5th at p. 638 ["The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent"].) Indeed, the parents are attempting to establish the parent/child beneficial exception *because* they have "presumptively *not* made sufficient progress in addressing the problems that led to dependency." (*Id.* at p. 637 ["Parents need not show that they are 'actively involved in maintaining their sobriety or complying substantially with their case plan' [citation] to establish the exception"].) Rather, in the court's analysis of the exception, the parents' failure must be viewed in terms of harm to the children, either in negative impacts to the parent/child bond or the child's overall stability and wellness. (*Ibid.* "[making a parent's continued struggles with the issues leading to dependency, standing alone, a bar to the exception would effectively write the exception out of the statute"].) As we discuss *post*, the parents' inability to progress with their case plans may be relevant to the court's balancing inquiry, but only because it "may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Ibid.*, quoting *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

The Agency also contends that the "parents' relationship with the children was more akin to that of a friendly visitor, as opposed to a parent."

The substantial evidence in the record and governing case law undermines this contention. Hicks testified that Father takes "an active parental role" during his visits, as did Mother. The children knew him as their father. Feeding, bathing, comforting, setting boundaries, and putting children to bed are not the activities of a "friendly visitor." They are those of a parent, and substantial evidence demonstrates that both parents made this showing at trial.

As to the third element, the trial court found that the benefits of adoption outweighed the detriment that would result from terminating parental rights. At trial, the parents had the burden to establish that the parent-child relationship "promote[d] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) On appeal, they must show that the court abused its discretion. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) They have not done so.

The evidence in the record of detriment to the children that would result from termination of parental rights is minimal. The only evidence that the parents introduced regarding detriment was Mother's testimony. Regarding harm to the children if her parental rights were severed, she testified that she believed that termination of the relationship would be harmful "Emotionally. Mentally. Probably physically. Overall, I know it would not be any good for the kids." She stated, "I personally think it will traumatize them in a way. Feeling unknown, unwanted, continually wondering like, where we are. Mentally and emotionally, I think it will impact them a lot, which will hurt them in the future." She also testified, "If [grandmother] were to cut ties—I know her well. I don't think she would even do that—but I just think it would be better for us."

Hick's testified that the children call Mother "mom," but that they do not "know her as mom." Hicks acknowledged that the children knew Father as their father, but nevertheless believed that while there would be "some" detriment to the children in severing the parental relationships, that detriment did not "outweigh[ ] the benefit of adoption; such as safety and stability that this caregiver's home provides to the children."

As stated *ante*, the only evidence before the juvenile court of harm to the children from severing the parental relationship was Hicks's statement that there would be "some" detriment, and Mother's testimony. In contrast, in *Caden C.*, the juvenile court held a hearing over four days. The evidence presented at the hearing included testimony from "numerous witnesses for both Mother and the Agency," a "bonding study from Mother's expert . . . ; a clinical consultation report from the Agency's expert . . . ; and a letter from Caden." (*Caden C.*, 11 Cal.5th at p. 627.) As the Supreme Court stated in *Caden C.*, "Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Id.* at p. 633, fn. 4). "[O]ften expert psychologists[,] who have observed the child and parent can synthesize others' observations[,] will be an important source of information about the psychological importance of the relationship for the child." (*Id.* at pp. 632–633.) Both experts agreed in *Caden C.* that the child had a "very strong emotional bond with his mother." (*Id.* at p. 627.) Mother's expert testified that "losing contact with Mother would compound Caden's other traumas leading to significant emotional fluctuation, confusion, and acting out in the near term and in adolescence." (*Id.* at p. 628.) The Agency's expert agreed. (*Ibid.*) The parents presented no such evidence in this case.

The court made its findings based on the entire record before it. The record in this case did not include any expert testimony or reports that might have assisted the court in evaluating the nature and importance of the relationship between parents and the children. It is not our role on appeal to "reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 (*Dakota*). Trial court's determinations should be upheld "even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence".) (*Ibid*.) Given the record before the court, including children's age, the lack of expert testimony, and the minimal evidence of harm to the children that would result from severing the parental relationships, the parents have failed to show that the court abused its discretion in determining that the beneficial parent-child relationship exception did not apply.

Moreover, while the parents' inability to overcome their challenges is not a bar to application of the beneficial parent/child exception, where, as here, the record shows that the parents lacked insight about their struggles and their relapses followed closely after positive movement toward reunification in the case, the court could properly infer ongoing harm to the children from maintaining the relationships. (*Caden C.*, *supra*, 11 Cal.5th at p. 638 ["the parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?"].) The record of how the parents' struggles impacted the children included incidents of mother driving under the influence with mother's nondependent child in the vehicle, violent

altercations in the presence of one of the children, threats of violence to each other, and the parents' arrests for intoxication-related offenses.

The parents contend that the juvenile court erred by according "undue weight" to evidence that, even after adoption, the paternal grandmother would allow continued contact between the parents and the children. The Agency disagrees and argues that the "juvenile court considered the permanent severance of contact between the parents and the children *as a possibility* in terminating parental rights"

In determining whether the beneficial parent-child relationship exception to adoption applies, the court's inquiry must presume that "terminating parental rights terminates the relationship" between the parents and the children. (*Caden C.*, 11 Cal.5th at p. 633, citing *In re C.B.* (2010) 190 Cal.App.4th 102, 128 (*C.B.*); *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1391; *Troxel v. Granville* (2000) 530 U.S. 57, 66–67.) In weighing the benefits and harms to the children in severing parental rights and contact, it is improper for the court to rely on " 'an unenforceable promise of future visitation by the child's prospective adoptive parents.' [Citation.]" (*C.B.*, at p. 128.) Although some of the court's comments could be understood to suggest that the court believed that the paternal grandmother would continue to allow the parents to have contact with the children even if their parental rights were terminated, interpreting the record in the light most favorable to upholding the orders, it does not appear that the court ultimately relied on this belief in deciding to terminate the parents' rights. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576 ["[W]e draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion"].)

In its ruling, the court stated, "Even if the court believed there was a possibility of some theoretical severance of contact with the parents, the court finds the benefits of adoption outweigh[ ] the detriment that would occur to the children. Of course, if the children were prevented from contact with the parents, their position that that would be damaging and that that would run the risk of the children feeling abandoned. And that is never a good thing." While the reality may be that the paternal grandmother will likely not terminate the parents' contact with the children, the court's statements show that it did properly consider actual termination of the parent-child relationship when it balanced the benefits and harms to the children in deciding to terminate parental rights. Notwithstanding some harm to the children that would result from termination, on this record we cannot conclude that the court abused its discretion in finding that the benefits to the children from adoption outweighed this harm.

In reaching this conclusion, we do not intend to minimize the clear benefits that the children received from visiting their parents throughout the dependency proceedings. In many respects, the facts of this case show a pattern of consistent visitation and positive beneficial interactions between parents and children that this court does not often see in dependency cases. We recognize that a different juvenile court may have come to a different decision when balancing the harms and benefits in this case. However, to overcome the presumption for adoption, the parents were required to provide clear and convincing evidence establishing that the detriment to the children from severing the relationship outweighed the benefits of adoption. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) On this question, we cannot conclude that the court abused its discretion; it is not our role to usurp the juvenile

court's judgment with our own. (*Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.)

For these reasons, we affirm the trial court's decision finding the beneficial parent/child exception inapplicable. Because we make this determination, we do not reach the parents' arguments that the court should have selected legal guardianship as the children's permanency plan.

B. *The Beneficial Sibling Relationship Exception*

Mother challenges the juvenile court's ruling that the beneficial sibling relationship exception did not apply with respect to her nondependent son M.E.'s relationship with E.B. and B.B.[7] The juvenile court found that E.B. and B.B. did not have a beneficial sibling relationship with M.E. that outweighed the benefits of adoption. Mother argues otherwise, pointing to evidence in the record establishing frequent positive visitation between the siblings.

The beneficial sibling relationship exception to adoption applies if the court concludes that "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, [1] whether the child was raised with a sibling in the same home, [2] whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and [3] whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) "[E]ven if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling

---

[7] On appeal, father joins mother's argument.

relationship against the benefit the child would receive by gaining a permanent home through adoption." (*L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 952–953; accord *Celine R.*, *supra*, 31 Cal.4th at p. 61.) The parent bears the burden of proof in the juvenile court to show the exception applies. (*L.Y.L.*, at p. 949.)

A court considering application of this exception must focus its analysis on the child or children being considered for adoption, not the other sibling. (*Celine R.*, *supra*, 31 Cal.4th at p. 54; accord *In re Daniel H.* (2002) 99 Cal.App.4th 804, 813 ["The court is specifically directed to consider the best interests of the adoptive child, not the siblings, and must ultimately determine whether adoption would be detrimental to the adoptive child, not the siblings"].) The statutory exception contains "strong language creating a heavy burden for the party opposing adoption." (*Ibid.*) It will be the "rare" case in which the exception is found to apply. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

On the parents' challenge to the juvenile court in finding the beneficial sibling relationship exception to the termination of parental rights does not apply, "we apply the substantial evidence standard to the juvenile court's underlying factual determinations, and the abuse of discretion standard to the court's weighing of competing interests." (*In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)

We conclude that the juvenile court did not err in finding that the sibling relationship exception did not apply. Mother acknowledges that the siblings spent little time living in the same home. Her older son's father had primary custody, which meant that M.E. and E.B. were raised in the same home only for the first seven months of E.B.'s life, when Mother had visitation with M.E. M.E. and B.B. spent time living in the same home only

during the three months that B.B. was in Mother's care.  There was little evidence presented of a bond between M.E., E.B. and B.B., although there was no dispute that the children interacted positively and lovingly during times that they visited.

Even if the parents had shown the existence of a strong bond between the siblings from frequent positive visitation, our focus must still be on whether the evidence supports a finding that adoption would lead to a "substantial interference" with that relationship.  (§ 366.26, subd. (c)(1)(B)(v).)  The evidence introduced in the juvenile court establishes that the termination of parental rights would not substantially interfere with the sibling relationship because the paternal grandmother repeatedly expressed that she was willing to maintain the relationship between E.B., B.B., and M.E., even after adoption.  She stated that M.E. was "like a son to her."  Grandmother took M.E. on trips with E.B. and B.B.  Based on this evidence, the juvenile court concluded that "there is no evidence that the current caregiver would do anything to thwart that relationship for some reason."  Neither parent presented any evidence to the contrary.  Grandmother's willingness to continue visitation is an appropriate consideration under the beneficial sibling relationship exception.  (See *D.O.*, *supra*, 247 Cal.App.4th at p. 176.)

The trial court did not abuse its discretion in finding that the sibling relationship exception did not apply.  Even when the interactions between siblings are "loving, affectionate, playful and nurturing," a trial court can reasonably conclude that a child's best interests are better served by the permanency of adoption.  (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1013; see also *In re D.M.* (2012) 205 Cal.App.4th 283, 293 [termination of sibling relationship not sufficiently detrimental despite a "pleasant relationship"

31

between siblings].)  Having reviewed the record, we see no error by the juvenile court in finding the beneficial sibling relationship exception to the termination of parental rights does not apply.

## DISPOSITION

The orders are affirmed.


AARON, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.